## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **Rapides Parish School Board**, | |
| *Plaintiff,* | |
| v. | **Case No.** 1:25-cv-00070 |
| **United States Department of Health and Human Services**; **Xavier Becerra**, in his official capacity as Secretary of the United States Department of Health and Human Services; **United States Department of Agriculture**; **Thomas Vilsack**, in his official capacity as Secretary of the United States Department of Agriculture; **United States Equal Employment Opportunity Commission**; **Charlotte Burrows**, in her official capacity as Director of the United States Equal Employment Opportunity Commission; **United States Department of Justice**; **Merrick B. Garland**, in his official capacity as Attorney General of the United States; and **Kristen Clarke**, in her official capacity as Assistant Attorney General for the Civil Rights Division of the United States Department of Justice, | **Judge** _____  **Magistrate Judge** _____ |
| *Defendants.* | |

## <u>COMPLAINT</u>

1.    Plaintiff Rapides Parish School Board brings this case to challenge five gender-identity mandates that the Biden administration imposes on schools.

2.      Unless public schools embrace a controversial gender ideology, Biden administration officials threaten to withhold federal funding for Head Start preschool programs, kids' school lunch programs, and kids' healthcare.

3.      Federal agencies have no statutory authority to impose these radical and atextual mandates. Instead, the Biden administration sought to rewrite the word "sex" to also mean "gender identity" and to redefine the word "disability" to include "gender dysphoria" in federal antidiscrimination statutes.

4.      This Court preliminarily enjoined the Department of Education's Title IX rule imposing a gender-identity mandate. *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377 (W.D. La. 2024), *stay denied*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024), and *stay denied sub nom. Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024). Rapides Parish School Board now challenges parallel and equally unlawful mandates from the U.S. Department of Health and Human Services (HHS), the U.S. Department of Agriculture (USDA), and the Equal Employment Opportunity Commission (EEOC).

5.      This Court should hold these gender-identity mandates unlawful, set them aside under the Administrative Procedure Act (APA), 5 U.S.C. § 706, and enjoin Defendants from enforcing them.

## JURISDICTION AND VENUE

6.      This action arises under the Constitution and laws of the United States and this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1361.

7.      This Court can award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57, 65.

8.     This Court may review Defendants' unlawful actions and enter appropriate relief as provided by the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 701–706.

9.     This Court has equitable jurisdiction and remedial power to review and enjoin ultra vires or unconstitutional agency action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

10.     This Court may award costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

11.     Venue is proper in this district under 28 U.S.C. § 1391. Plaintiff resides in this division, and a substantial part of the events or omissions giving rise to the claims occurred in this division.

## PARTIES

### I.     Plaintiff Rapides Parish School Board

12.     Plaintiff Rapides Parish School Board is located at 619 Sixth Street, Alexandria, Louisiana 71306.

13.     The school board operates 42 schools for students from pre-K through 12th grade. For the 2023–2024 school year, the pre-K through 12th grade student body numbered about 21,000.

14.     The school board has about 3,200 employees.

### II.     Federal Government Defendants

15.     Defendant United States Department of Health and Human Services (HHS) is an agency under 5 U.S.C. §§ 551 and 701(b)(1). HHS's address is 200 Independence Avenue, SW, Washington, D.C. 20201.

16.     Defendant Xavier Becerra is sued in his official capacity as Secretary of HHS. His address is 200 Independence Avenue, SW, Washington, D.C. 20201.

17.    Defendant United States Department of Agriculture (USDA) is an agency under 5 U.S.C. §§ 551 and 701(b)(1). USDA's address is 1400 Independence Avenue, SW, Washington, D.C. 20250.

18.    Defendant Thomas Vilsack is sued in his official capacity as USDA Secretary. His address is 1400 Independence Avenue, SW, Washington, DC 20250.

19.    Defendant Equal Employment Opportunity Commission (EEOC) is a federal agency under 5 U.S.C. §§ 551 and 701(b)(1). EEOC administers, interprets, and enforces Title VII. EEOC's address is 131 M Street, NE, Washington, D.C. 20507.

20.    Defendant Charlotte A. Burrows is sued in her official capacity as Chair of the EEOC. She is responsible for the administration and implementation of policy within EEOC, including investigation and enforcement under Title VII. Her address is 131 M Street, NE, Washington, D.C. 20507.

21.    Defendant United States Department of Justice (DOJ) is an agency under 5 U.S.C. §§ 551 and 701(b)(1). DOJ's address is 950 Pennsylvania Avenue NW, Washington, D.C. 20530. DOJ implements and enforces the agency gender-identity mandates at issue, including by bringing enforcement actions for noncompliance.

22.    Defendant Merrick B. Garland is sued in his official capacity as Attorney General of the United States. His address is 950 Pennsylvania Avenue NW, Washington, D.C. 20530. The Attorney General is responsible for the overall operations of the U.S. Department of Justice.

23.    The Attorney General implements and enforces the various agency gender-identity mandates, including by bringing enforcement actions for noncompliance. The Attorney General coordinates Title IX's implementation and enforcement by other executive agencies, including by approving regulations and

orders of general applicability. 20 U.S.C. § 1682; Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); 28 C.F.R. § 0.51.

24.    Defendant Kristen Clarke is sued in her official capacity as Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice. Her address is 950 Pennsylvania Avenue NW, Washington, D.C. 20530.

25.    Defendant Clarke implements and enforces Title IX and the agency gender-identity mandates at issue, including by bringing enforcement actions for noncompliance on behalf of agencies that administer federal funding programs. 28 C.F.R. § 42.412. Defendant Clarke coordinates Title IX's implementation and enforcement by other executive agencies. 20 U.S.C. § 1682; Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); 28 C.F.R. §§ 0.51, 42.412.

## FACTUAL AND LEGAL BACKGROUND

### I.    The Biden Administration Twists Federal Civil Rights Laws to Impose Gender-Identity Mandates.

26.    At the direction of President Biden, administrative agencies created and implemented gender-identity mandates throughout federal law.

27.    On his first day in office, President Biden declared that any statutory reference to "sex" discrimination also includes gender-identity discrimination "so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021). The President ordered all of his executive-branch agencies to implement this view. *Id*.

28.    Later, President Biden issued a second executive order specific to Title IX, with similar provisions: "all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination

in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity."[1]

29.     Soon, the Departments of Education and Justice issued memoranda instructing all federal agencies that Title IX of the Education Amendments of 1972 addresses gender identity and sexual orientation, even though both departments had reached the opposite conclusions only months before.[2]

## II.     The HHS Head Start Gender-Identity Mandate

### A.     Head Start statutes provide low-income kids access to preschool.

30.     Head Start statutes protect the equal opportunities of girls to access education programs. *See* Pub. L. 97-35, Title VI, § 654, Aug. 13, 1981, 95 Stat. 507.

31.     Services in the federal Head Start program are available to children ages birth to 5.

---

[1] Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021); *see also* Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals, Exec. Order No. 14,075, 87 Fed. Reg. 37,189 (June 15, 2022) (calling for increased federal agency involvement in this area).

[2] *Compare* DOJ, Memorandum from Pamela S. Karlan, Principal Deputy Assistant Attorney General, Civil Rights Division, to Federal Agency Civil Rights Director and General Counsels Regarding Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), https://perma.cc/TUL5-9GAN; Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021), *with* DOJ, Memorandum from Acting Assistant Attorney General John B. Daukus to the Civil Rights Division Regarding Application of *Bostock v. Clayton County* (Jan. 17, 2021), https://web.archive.org/web/20210120125231/https://www.justice.gov/crt/page/file/1356531/download; U.S. Dep't of Educ., Memorandum from Reed D. Rubinstein, Principal Deputy General Counsel, to Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights Regarding *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), https://perma.cc/Q9YC-Q4Y2.

32.     Key language in one of the Head Start statutes—42 U.S.C. § 9849—says "No person in the United States shall on the ground of sex be excluded from participation in, be denied the benefits of, be subjected to discrimination under, or be denied employment in connection with any program or activity receiving assistance under this subchapter." 42 U.S.C. § 9849(b). Furthermore, HHS "shall not provide financial assistance for any program, project, or activity under this subchapter unless the grant or contract with respect thereto specifically provides that no person with responsibilities in the operation thereof will discriminate with respect to any such program, project, or activity because of … sex." 42 U.S.C. § 9849(a).

33.     The Head Start statutes consider sex in binary, biological terms.

34.     For example, they repeatedly consider the needs of "pregnant women." 42 U.S.C. §§ 9840(a)(5)(A)(iii) & (d)(3), 9840a(c)(1) & (i)(2)(G), 9852b(d)(2)(C).

35.     42 U.S.C. § 9849 does not mention or address gender identity.

36.     Title VI of the Civil Rights Act's enforcement mechanisms apply to the Head Start sex-discrimination provisions. 42 U.S.C. § 9849(b).

37.     HHS may investigate and withhold funds for violations.

**B.     HHS's unlawful rules impose gender-identity mandates on pain of losing Head Start funding.**

38.     HHS first tried to issue a gender-identity mandate for human services programs as a "public policy" requirement in 2016. Health and Human Services Grants Regulation, 81 Fed. Reg. 89,393 (Dec. 12, 2016) (the 2016 Grants Rule) (codified at 45 C.F.R. § 75.300). The sole authority HHS relied on was the multi-agency housekeeping statute, 5 U.S.C. § 301, which lets an agency head regulate "the government of his department."

39.     The housekeeping statute does not give agencies authority to create substantive law, but only to regulate their internal affairs.

40.    In 2024, HHS rescinded the 2016 Grants Rule and issued a new gender-identity rule for many human services programs, including Head Start. Health and Human Services Grants Regulation, 89 Fed. Reg. 36,684 (May 3, 2024) (the 2024 Grants Rule).

41.    In the 2024 Grants Rule, HHS recognized that it lacked statutory authority in the housekeeping statute for the 2016 Grants Rule. 89 Fed. Reg. at 36,690.

42.    The 2024 Grants Rule redefined "sex" in 42 U.S.C. § 9849 to mean "gender identity."

43.    Later in 2024 the White House's Office of Management and Budget (OMB) issued a model grants rule for all agencies. Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (April 22, 2024) (the OMB Grants Rule).

44.    HHS then reconsidered, reissued, and recodified the 2024 Grants Rule in light of the OMB Grants Rule, but it did so without notice or comment. Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80,055 (interim final rule October 2, 2024) (the 2024 Interim Grants Rule).

45.    For convenience, the 2024 Interim Grants Rule, particular in its codification of 2 C.F.R. § 300.300, is called in this complaint the HHS Head Start Gender-Identity Mandate.

46.    The school board challenges each rule, to the extent that each has or would have any effect or that each is or would be the subject of enforcement.

47.    The HHS Head Start Gender-Identity Mandate seeks to rewrite thirteen federal sex-discrimination provisions in grants programs to address "gender identity," including the Head Start sex-discrimination statute, 42 U.S.C. § 9849. 89 Fed. Reg. at 80,062 (to be recodified at 2 C.F.R. Section 300.300(c)).

48.     In addition, the preamble to the 2024 Grants Rule includes expansive language encompassing intersex traits and gender expression. 89 Fed. Reg. at 36,689; Health and Human Services Grants Regulation, 88 Fed. Reg. 44,750, 44,753 n.11 (proposed July 13, 2023).

49.     By seeking to redefine sex in Head Start preschool programs, the HHS Head Start Gender-Identity Mandate threatens to require preschools to expose very young children to inappropriate material and to teach them to question their gender—regardless of parents' views.

50.     HHS did not provide prior notice to the public or an opportunity to comment consistent with the Administrative Procedure Act for the 2024 Interim Grants Rule.

51.     The comments submitted on the 2024 Grants Rule and the OMB Grants Rule do not justify promulgation of the 2024 HHS Interim Grants Rule without notice and comment.

52.     The HHS Head Start Gender-Identity Mandate imposes compliance costs on schools.

53.     HHS estimated that grantees would incur "legal and other familiarization costs" from such activities as reading the detailed rules, revising policies, and implementing them in school operations. 89 Fed. Reg. at 36,698.

54.     HHS estimated this cost to be .68 hours of employee time at $93.20 per hour. *Id.* at 36,700.

55.     This cost estimate is likely a vast underestimate, as HHS assumed without evidence that "there would be no additional economic impact" from implementing this gender-identity mandate in school operations. *Id.* at 36,703.

56.     To comply with the HHS Head Start Gender-Identity Mandate, Plaintiff Rapides Parish School Board would need to devote significant time and resources to creating or updating policies, customs, or training programs. It would

take a minimum of several hours of employee time to comply, imposing costs well above $1,000 of lost employee time.

## III.    The Section 1557 Rule

### A.    Section 1557 of the Affordable Care Act's incorporation of Title IX addresses women's unique health needs.

57.    In 2010, Congress approved, and President Obama signed into law, the Patient Protection and Affordable Care Act ("ACA"). Pub. L. No. 111-148, 124 Stat. 119 (March 23, 2010).

58.    Section 1557 of the ACA states:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual *shall not, on the ground prohibited under* title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), *title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.),* the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29 [commonly known as Section 504 of the Rehabilitation Act], *be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or* activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a) (emphasis added).

59.    Section 1557 does not create any new bases of prohibited discrimination.

60.    By referencing Title IX and three other well-established federal nondiscrimination provisions, Congress incorporated the legal standards that define discrimination under each into Section 1557.

61.    Section 1557 does not prohibit discrimination on the basis of sex beyond the degree to which such discrimination is prohibited by Title IX.

10

62.     When the ACA was enacted in 2010, no federal court or agency had interpreted Title IX's prohibition on sex discrimination to include gender identity.

63.     The ACA does not mention gender identity.

64.     The ACA refers to sex and the sexes with biologically binary language.

65.     The ACA acknowledges that medical practice is biological.

66.     The ACA is tailored to advance health according to biological distinctions between the male and female sexes.

67.     Section 1557 applies to what HHS calls "covered entities," which are recipients of federal financial assistance from HHS, such as Medicaid.

68.     Under HHS's Section 1557 rule, an entity that "any part of which" participates in HHS financial assistance in health programs is subject *in all aspects* to Section 1557. All the operations of the covered entity are covered—not merely that part of the covered entity that receives the funding. 45 C.F.R. § 92.2(a)(1).

69.     Rapides Parish School Board receives Medicaid funds, subjecting its operations to Section 1557.

70.     The ACA incorporates Title IX's enforcement mechanisms as well as HHS's implementing regulations for Section 1557. 42 U.S.C. § 18116(a).

71.     If HHS through its Office for Civil Rights (OCR) finds a covered entity in noncompliance, HHS may require it to either take remedial action or lose funding.

72.     OCR or the Attorney General may investigate the entity for violations of Section 1557 and demand that the entity produce internal documentation. 18 U.S.C. § 3486; 45 C.F.R. §§ 80.6–80.11; 45 C.F.R. pt. 81; 45 C.F.R. § 92.5.

73.     Violators may be excluded from eligibility for health funding. 42 U.S.C. §§ 1320a-7, 1320c-5.

74.     The public may file with OCR complaints about entities that they believe are not complying with Section 1557 or HHS's implementing regulations.

75.   OCR will accept and investigate complaints filed under the 1557 rule.

**B.   HHS's unlawful Section 1557 Rule imposes gender-identity mandates on pain of losing Medicaid funding.**

76.   In May 2024, the Biden administration interpreted Section 1557's incorporation of Title IX to prohibit discrimination based not only on sex but also on gender identity (the Section 1557 Rule).

77.   HHS's Section 1557 Rule provides HHS's binding interpretation of Section 1557's incorporation of Title IX.

78.   The Section 1557 Rule requires that covered entities "provide individuals equal access to [their] health programs and activities without discriminating on the basis of sex." Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522, 37,700 (May 6, 2024); *see* 89 Fed. Reg. at 37,694 (to be codified at 45 C.F.R. § 92.4) (defining covered entities).

79.   Under the Section 1557 Rule, "[d]iscrimination on the basis of sex includes, but is not limited to, discrimination on the basis of … gender identity." 89 Fed. Reg. at 37,698–99, 37,701 (to be codified at 45 C.F.R. §§ 92.101(a)(2), 92.208, 92.209).

80.   The Section 1557 Rule not only defines "gender-identity" discrimination to be sex discrimination, it also separately defines "sex stereotypes" to encompass gender-identity discrimination, 89 Fed. Reg. at 37,699, and it suggests that gender dysphoria is a disability under Section 504 of the Rehabilitation Act. *See infra* Pt. IV.

81.   The Section 1557 Rule provides for discriminatory-intent liability, disparate-impact liability, hostile-environment liability, harassment liability, and other theories of liability based on its new definition of sex discrimination.

82.   The Section 1557 Rule considers it discriminatory to adopt or apply any policy or practice of treating individuals differently or separating them on the

basis of sex in a manner that subjects any individual to more than de minimis harm, including by adopting a policy or engaging in a practice that prevents an individual from participating in a health program or activity consistent with the individual's gender identity.

83.    The rule says that merely "experiencing … distress" is enough to cross that de minimis threshold. *Id*. at 37,593.

84.    Under the Section 1557 Rule's revised Medicaid regulations, contracts with entities that deliver services must now include a promise that the entities will not treat individuals who identify as a different gender consistent with their sex and will not use any policy or practice that has the effect of doing the same. 89 Fed. Reg. at 37,691 (to be codified at 42 C.F.R. §§ 438.3 & 438.206).

85.    States and entities that deliver Medicaid or CHIP services must "promote the delivery of services in a culturally competent manner to all enrollees,… and regardless of sex which includes … gender identity." *Id*. at 37,691–92 (to be codified at 42 C.F.R. §§ 440.262 (Medicaid), 457.495(e)).

86.    The Section 1557 Rule's mandates extend to the use of sex-separated "intimate space[s]." 89 Fed. Reg. at 37,593.

87.    The Section 1557 Rule forces females to share private spaces with males when the male identifies as female or non-binary.

88.    When a male identifies as female or non-binary, covered entities must permit males to access female private spaces or programs, such as sex-specific locker rooms, showers, restrooms, and overnight accommodations.

89.    In the Plaintiff Rapides Parish School Board's school settings, this could include physical education classes, athletics, locker rooms, restrooms, and overnight field trips.

90.     The Section 1557 Rule considers it discrimination or a hostile environment for a covered entity or its staff to speak in a way that denies the legitimacy of "gender transition."

91.     The Section 1557 Rule forces covered entities to use self-selected pronouns contrary to sex according to biology. 89 Fed. Reg. at 37,596, 37,698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206).

92.     Under the Section 1557 Rule, covered entities must be willing to say that males can get pregnant, give birth, or breastfeed.

93.     As HHS explained in its proposal, covered entities are responsible for "discrimination, stigma, and erasure" if they speak or act in way that treats "pregnancy and childbirth as something exclusively experienced by … women." Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824, 47,865 (proposed Aug. 4, 2022).

94.     In Plaintiff Rapides Parish School Board's school setting, this would affect not only how speech occurs around employees and students generally, but how the school teaches health classes, and what the books in the school's libraries say about biological reality.

95.     HHS enforces its gender-identity mandates.

96.     The Section 1557 Rule admits that it imposes compliance costs by requiring entities to read the lengthy rule, revise policies, and implement the new mandate in all operations, submit assurances or certifications of compliance, adopt policies ensuring compliance by and within the entity, notify patients of compliance through new nondiscrimination notices, train staff to comply on an initial and ongoing basis, document the training, maintain documentation for several years, document complaints the entity receives, and create and maintain a Section 1557 coordinator on their staff. 89 Fed. Reg. at 37,693, 37,696–701 (to be codified at 45 C.F.R. §§ 92.1(b), 92.5, 92.8, 92.9, 92.10, 92.101, 92.206).

97. To comply with the Section 1557 Rule, the school board would need to devote significant time and resources to creating or updating policies, customs, or training. It would take several hours of employee time to comply, imposing costs well above $1,000 of lost employee value.

98. At least three courts have already concluded that the 1557 Rule is likely unlawful and collectively enjoined its enforcement nationwide.

## IV.  The Section 504 Rule

### A.  Section 504 accommodates people with disabilities.

99. Section 504 of the Rehabilitation Act allows individuals to participate in federal programs free from discrimination based on disability.

100. Under Section 504, "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

101. A covered "program or activity" includes "all of the operations" of:

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department of agency (and each other State of local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

…; [and]

[(2)](B) a local educational agency (as defined in section 7801 of title 20), system of career and technical education, or other school system;

….

any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).

102.    The Rehabilitation Act defines "disability" as "a physical or mental impairment that constitutes or results in a substantial impediment to employment." 29 U.S.C. § 705(9)(A); *see also id*. § 705(20).

103.    The Act also incorporates by reference the definition of disability found in the Americans with Disabilities Act (ADA), 29 U.S.C. § 705(9)(B). 42 U.S.C. § 12102(1)(A).

104.    Congress specified that when it comes to the Rehabilitation Act and ADA's coverage, the term "individual with a disability" does not include an individual with a gender-identity disorder not resulting from physical impairments. 29 U.S.C. § 705(20)(C), (F)(i); 42 U.S.C. § 12211(a), (b)(1). That is, a person diagnosed with the mental-health condition gender dysphoria—but no physical impairment—would not be an "individual with a disability."

105.    When Congress passed the Rehabilitation Act in 1973 and the ADA in 1990, gender identity disorder was understood to include what today is considered gender dysphoria—that is, distress and discomfort from identifying as a gender different from one's sex.

106.    Those terms were synonymous with professing a transgender identity, so such persons that do not have a disorder of sex development—a physical impairment—do not have a "disability."

107.    The Rehabilitation Act excludes "gender identity disorders" from the definition of "disability," and excludes "transvestism, transsexualism … gender identity disorders not resulting from physical impairments, or other sexual behavior disorders." 29 U.S.C. § 705(20)(F)(i).

108.    The ADA likewise excludes from its definition of disability "gender identity disorders not resulting from physical impairments" and "other sexual behavior disorders." 42 U.S.C. § 12211(b)(1).

109.    Individuals experiencing incongruity between their biological sex and their internal sense of gender, or who have gender dysphoria, or who identify as the opposite sex, transgender, or non-binary, do not, on that basis, have a disability encompassed by Section 504.

110.    HHS's Section 504 regulations incorporate the enforcement mechanisms of Title I of the ADA, 42 U.S.C. §§ 12111 et seq. as to employers. *See* Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 40,066, 40,185 (May 9, 2024) (codified at 45 C.F.R. § 84.16(b)).

111.    Title I adopts the powers, remedies, and procedures of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e-4 et seq.; *see infra* Pt.VII.B.

112.    Under Title VII, EEOC will accept and investigate employee complaints against employers. 42 U.S.C. §§ 2000e-5(b) & (f), 2000gg-2; *see also* 42 U.S.C. §§ 2000e-8, 2000e-9.

113.    Under these mechanisms, EEOC may bring a civil action or issue a notice to the employee of his right to sue. 42 U.S.C. § 2000e-5(f). With a government employer, EEOC refers the case to the Attorney General who can bring suit or issue a right-to-sue notice to the employee. *Id*. Besides individual charges, the Attorney General can bring a civil action against an employer based on "a pattern or practice of resistance." 42 U.S.C. § 2000e-6.

114.    The Section 504 Rule explains that under these Section 504 procedures "individuals who have experienced discrimination in the workplace may file complaints with [HHS] OCR" (not EEOC), and HHS may only refer Section 504 employment disability-discrimination complaints to EEOC if HHS lacks jurisdiction over them. 89 Fed. Reg. at 40,075.

115.    HHS's Section 1557 Rule also applies Section 504 to Medicaid providers, and so the enforcement mechanisms of Section 1557 and Section 504 apply to Medicaid providers. 42 U.S.C. § 18116(a).

**B.    HHS's unlawful Section 504 Rule imposes gender-identity mandates on pain of losing Head Start and Medicaid funding.**

116.    In 2024, HHS amended its Section 504 Rule to make gender dysphoria a protected disability. 89 Fed. Reg. at 40,068–69.

117.    The Section 504 Rule's preamble states that "gender dysphoria ... may be considered a physical or mental impairment" entitled to protection. 89 Fed. Reg. 40,069.

118.    HHS says that the Section 504 Rule applies to childcare, preschool, elementary, and secondary education programs that receive federal financial assistance. 89 Fed. Reg. at 40,187 (codified at 45 C.F.R. § 84.31).

119.    These "childcare, preschool, elementary and secondary" education programs "may not, on the basis of disability, exclude qualified individuals with disabilities and shall take into account the needs of such persons in determining the aids, benefits, or services to be provided." 89 Fed. Reg. at 40,187 (codified at 45 C.F.R. § 84.38).

120.    According to HHS, such educational settings must now treat individuals based on gender-identity, not sex.

121.    HHS supported the Section 504 Rule by citing "the position taken by the Department of Justice's Civil Rights Division on the proper interpretation of 'gender identity disorders' under the ADA and section 504." 89 Fed. Reg. at 40,069 & n.15 (citing Statement of Interest, *Doe v. Ga. Dep't of Corr.*, No. 23–5578 (N.D. Ga. Jan. 8, 2024), ECF No. 69).

122.    DOJ sued the state of Utah under the ADA to compel the state to house males with gender dysphoria in female prisons and allow them to dress as women.[3] *United States v. Utah*, No. 2:24-cv-00241 (D. Utah filed Apr. 2, 2024).

123.    DOJ has written to other states seeking to impose similar interpretations of Section 504 to force states to pay for gender-transition procedures under Section 504.

124.    DOJ also sent a letter to state attorneys general to "remind" them that the ADA and "Section 504 of the Rehabilitation Act of 1973 protects people with disabilities, which can include individuals who experience gender dysphoria. Restrictions that prevent, limit, or interfere with otherwise qualified individuals' access to care due to their gender dysphoria, gender dysphoria diagnosis, or perception of gender dysphoria may violate Section 504."[4]

125.    HHS requires that covered entities expend time, money, and resources to comply with its Section 504 Rule.

126.    Schools such as Plaintiff Rapides Parish School Board's likely need to comply by allowing students to access physical education classes, athletics, locker rooms, restrooms, and overnight accommodations on field trips based on their gender identity.

127.    HHS estimates that the Section 504 Rule (which imposes many other mandates as well) creates about $1.3 billion in various aggregate compliance costs. 89 Fed. Reg. at 40,176.

---

[3] *See Justice Department Finds Utah Prison System Discriminated Against Incarcerated Individual Based on Gender Dysphoria* (Mar. 12, 2024), https://perma.cc/9JUW-XSUQ.

[4] DOJ, Letter from Kristen Clarke, Assistant Attorney General, to State Attorneys General (Mar. 31, 2022), https://www.justice.gov/opa/press-release/file/1489066/dl?inline=.

128.    HHS expects that covered entities must make "revisions to policies and procedures and training for employees" in response to various provisions of the rule. *Id.*

129.    Inexplicably, HHS's cost estimates did not include compliance with the gender-identity mandate.

130.    The Section 504 Rule will impose compliance costs because it requires schools to read the lengthy rule, revise policies, and implement the new mandate in all school operations.

131.    To comply with the Section 504 Rule, the Plaintiff schools would need to devote significant time and resources to creating or updating policies, customs, or training programs. It would take several hours of employee time to comply with this mandate alone, imposing costs well above $1,000 of lost employee value.

## V.    The USDA School Lunch Mandate

### A.    Title IX of the Education Amendments of 1972 and USDA's National School Lunch Program help feed hungry kids.

132.    Nutritious meals are essential to the success of the students both inside and outside the classroom.

133.    When children eat balanced meals, they are healthier and happier, they are more focused in the classroom, and their overall behavior improves.

134.    The Richard B. Russell National School Lunch Act was signed into law by President Harry Truman in 1946. The National School Lunch Program, established under the Act and administered at the Federal level by the Food and Nutrition Services of the USDA, reimburses participating schools for serving free lunches to students from households with incomes at or below 130 percent of the Federal poverty line.

135.    The School Breakfast Program, which began in 1975, reimburses participating schools for the free breakfast served to students from households with incomes at or below 130 percent of the Federal poverty line.

136.    Through the Afterschool Snacks Program, participating schools can offer nutritious snacks as part of after-care educational programs or enrichment activities.

137.    USDA Food and Nutrition Service administers these and other nutrition programs like the Child and Adult Care Food Program, Summer Food Service Program, Fresh Fruit and Vegetable Program, and USDA Foods in Schools Program. For convenience, they are collectively referred to herein as the School Lunch Program.

138.    Under Title IX of the Education Amendments of 1972, schools participating in these programs to feed kids agree not to discriminate based on sex. *See* 7 C.F.R. § 15a.400.

139.    USDA's website makes clear that it applies this Title IX requirement to all *people* involved in a school's activities—not merely to students in the lunch line: "Sex discrimination involves treating someone (anyone participating in an educational program, service, or activity, e.g., an applicant, employee, participant, or student) less favorably because of that person's sex."[5]

140.    USDA administers, interprets, and enforces Title IX, and it investigates complaints and brings enforcement actions against program participants for Title IX violations.

141.    Secretary Vilsack has delegated authority to the Assistant Secretary for Civil Rights, 7 U.S.C. § 6918(c), "to enforce Title IX" and "to enforce related

---

[5] USDA, Nat'l Inst. of Food & Agric., Equal Opportunity Staff, "Title IX Fact Sheet" (Rev. 2021), https://nifa.usda.gov/sites/default/files/resource/USDA%20NIFA_TitleIX%20Fact%20Sheet_2pages%20508_DOJ%20Remediated.pdf.

Executive Orders, Congressional mandates, and other laws." 7 C.F.R. § 2.25(a)(1)(iii), (vi).

142.    USDA's Office of the Assistant Secretary for Civil Rights receives, investigates, and adjudicates discrimination complaints in USDA programs.[6]

143.    Title IX is also enforced jointly by the USDA Food and Nutrition Service Civil Rights Division[7] and by the USDA National Institute of Food and Agriculture Office of Equal Opportunity and Civil Rights,[8] both of which also collect, investigate, and adjudicate discrimination complaints.

144.    Program participants may file a discrimination complaint with USDA offices through an online form.[9]

145.    DOJ also has the authority to enforce Title IX. Exec. Order No. 12,250, 28 C.F.R. part 41, app. A (1980).

146.    Federal regulations require state administrative partners to assure compliance with Title IX at the application or award stage. 7 C.F.R. §§ 15a.115, 210.23, 225.3, 225.7.

### B.    USDA's unlawful Title IX departmental regulation imposes gender-identity mandates on pain of losing school lunch funding.

147.    USDA has misapplied Title IX to impose gender-identity mandates on the national School Lunch Program.

---

[6] USDA, Office of Assistant Secretary for Civil Rights, https://perma.cc/F4BY-JC84; USDA, Office of Assistant Secretary for Civil Rights Center for Civil Rights Enforcement, https://perma.cc/THQ7-TPAT.

[7] USDA, Food & Nutrition Serv., About the FNS Civil Rights Division, https://perma.cc/3N47-HUFL.

[8] USDA, Nat'l Inst. of Food & Agric., Civil Rights Policies, https://www.nifa.usda .gov/equal-opportunity-civil-rights/civil-rights-policies (last visited Jan. 17, 2025).

[9] USDA, Office of Assistant Secretary for Civil Rights, Filing a Program Discrimination Complaint as a USDA Customer, https://perma.cc/NLQ6-4B44.

148.    With no prior notice or public comment, USDA posted on its website a self-styled "departmental regulation" redefining sex in Title IX to mean "Sex (including sexual orientation and gender identity)."[10]

149.    USDA's departmental regulation states, "No person will be excluded from participation in, denied the benefits of, or otherwise subjected to discrimination in programs or activities receiving financial assistance from USDA based on … Sex (*including … gender identity*)." *Id.* § 4 (emphasis added).

150.    Issued under its Title IX enforcement authority, USDA said that this "regulation applies to all programs and activities receiving Federal financial assistance from USDA Mission Areas and agencies." *Id.* § 3 & App. C.

151.    USDA's website directs Title IX complainants to this departmental regulation.[11]

152.    USDA then posted several more "guidance" memoranda and documents on its website explaining how it intended to enforce this misreading of Title IX.

153.    USDA issued a "policy update" that "clarifies prohibitions against discrimination based on sex in all FNS programs found in Title IX of the Education Amendments of 1972" to "prohibit discrimination on the basis of gender identity and sexual orientation."[12]

---

[10] USDA, Departmental Regulation, DR 4330-002, *Nondiscrimination in Programs and Activities Receiving Federal Financial Assistance from USDA* (July 27, 2021), https://www.usda.gov/sites/default/files/documents/DR4330-002.pdf (DR 4330-002).

[11] USDA, Nat'l Inst. of Food & Agric., Civil Rights Policies, *supra* note 8.

[12] USDA, Memorandum from Roberto Contreras, Director of Civil Rights Division, Food and Nutrition Service, to Regional and State Directors Regarding CRD 01-2022 Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing—Policy Update at 1 (May 5, 2022), https://www.fns.usda.gov/sites/default/files/resource-files/crd-01-2022.pdf (Policy Update).

154.   This policy update cited in support President Biden's executive orders, memoranda from the Departments of Education and Justice, and the Biden administration's misreading of *Bostock*.

155.   USDA thus incorporated by reference the position of those sources, which extend Title IX to academic, extracurricular, athletic, and other education programs or activities, as well as their expansive harassment theory of liability, which extends to speech and instruction.

156.   USDA then directed that this policy update must be implemented by state officials administering school programs. *Id.* at 3.

157.   The policy update attached a question-and-answer document[13] and a letter to States reiterating the need for immediate compliance by program participants.[14]

158.   The Q&A document tells program participants that they must adopt USDA's new policy, explicitly including gender identity, as their own and display it on posters at their schools. Q&A at 2.[15]

---

[13] USDA, Memorandum from Roberto Contreras, Director of Civil Rights Division, Food and Nutrition Service, to Regional and State Directors Regarding Questions and Answers Related to CRD 01-2022 Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing—Policy Update (May 5, 2022), https://fns-prod.azureedge.us/sites/default/files/resource-files/crd-01-2022-qa.pdf (Q&A).

[14] USDA, Cover Letter from Roberto Contreras, Director of Civil Rights Division, Food and Nutrition Service, to Regional Program Directors and State Agencies Regarding Application of *Bostock v. Clayton County* to Program Discrimination Complaint Processing—Policy Update (May 5, 2022), https://fns-prod.azureedge.us/sites/default/files/resource-files/crd-01-2022-letter.pdf (State Letter).

[15] USDA, Poster, And Justice For All FNS USE ONLY (revised May 2022), https://www.fns.usda.gov/sites/default/files/resource-files/ajfa-green-030223.pdf; USDA, Food & Nutrition Serv., USDA Nondiscrimination Statement, https://perma.cc/QF7E-XPER. The new posters do not limit the scope of compliance to school feeding programs.

159.    USDA gave a grace period for non-compliance with adopting the new posters and nondiscrimination statement while USDA is "ordering and displaying posters and reprinting documents," but emphasized "there will not be a grace period for accepting and processing discrimination complaints based on sexual orientation and gender identity in [USDA] programs." Q&A at 3.

160.    Secretary Vilsack then issued a press release, citing President Biden's Executive Orders and pledging to "root[ ] out discrimination in any form—including discrimination based on sexual orientation and gender identity," to "provide … an avenue to grieve any discrimination," and to stand "firm" to "bring about much-needed change."[16]

161.    The press release repeated that "state and local agencies, program operators and sponsors that receive funds from [USDA] must investigate allegations of discrimination based on gender identity or sexual orientation" and "must also update their non-discrimination policies and signage to include prohibitions against discrimination based on gender identity and sexual orientation." *Id*.

162.    For convenience, the USDA departmental regulation and subsequent agency documents explaining the departmental regulation's Title IX mandate's requirements are collectively called the USDA School Lunch Gender-Identity Mandate.

163.    This mandate applies to all school activities, including athletics, restrooms, overnight accommodations, dress codes, employment, curricula, and daily conversations.

164.    It requires the use of self-selected pronouns based on gender identity.

---

[16] Press Release, USDA Promotes Program Access, Combats Discrimination Against LGBTQI+ Community (May 5, 2022), https://perma.cc/8A2K-QCCL (Press Release).

165.    USDA never gave prior notice to the public or an opportunity to comment on the USDA School Lunch Gender-Identity Mandate or published it in the *Federal Register*.

166.    USDA did not delay the effective date of the USDA School Lunch Gender-Identity Mandate for 30 days until after publication of a final rule in the *Federal Register*.

167.    USDA takes the position that departmental regulations do not go through a notice or comment process because they are solely internal to the federal government.[17]

168.    No Senate-confirmed official signed the departmental regulation, the policy update, the Q&A, or the State Letter.

169.    USDA has insisted it will enforce this mandate. DR 4330-002, § 4; State Letter at 1.

170.    USDA invited public complaints so that it may enforce this new requirement, and it promises to investigate them. DR 4330-002, § 5(a)(1).

171.    USDA enforcement proceedings may include payment of damages and may include action under 7 C.F.R. §§ 15.8–15.10 to terminate or suspend all USDA financial assistance. DR 4330-002, §§ 5–6.

172.    USDA declared "program operators will have to update their program discrimination complaint processing procedures for allegations related to services and activities receiving federal financial assistance from the USDA to ensure discrimination complaints alleging sexual orientation and gender identity discrimination are processed as complaints of prohibited sex discrimination." Q&A at 2.

---

[17] See, e.g., USDA, Departmental Directives System, DR 0100-001 (Jan. 4, 2018), https://www.usda.gov/directives/dr-0100-001.

173.    State officials implementing this mandate disqualified private schools in Florida and California from school lunch funding. *See Faith Action Ministry Alliance dba Grant Park Christian Academy v. Fried*, No. 8:22-cv-01696 (M.D. Fla. filed July 27, 2022); *Church of Compassion v. Bonta*, No. 3:23-cv-00470 (S.D. Cal. filed Mar. 15, 2023).

174.    Those cases were resolved favorably to the private schools involved based on religious liberty exceptions.

175.    Religious liberty exceptions are unavailable to the Plaintiff here.

176.    The USDA School Lunch Gender-Identity Mandate requires schools to read the departmental regulation, revise policies, issue new nondiscrimination notices, post new USDA-approved posters, and implement the mandate in all operations.

177.    To comply with the USDA School Lunch Gender-Identity Mandate, the school board would need to devote significant time and resources to creating or updating policies, customs, or training programs. It would take several hours of employee time to comply with this mandate alone, imposing costs well above $1,000 of lost employee value.

## VI.    The Unlawful EEOC Gender-Identity Mandate

178.    EEOC has unlawfully sought to go beyond its Title VII authority to impose a far-reaching gender-identity mandate on employers.

179.    EEOC interprets discrimination on the basis of sex in Title VII as encompassing discrimination on the basis of gender identity in all aspects of employment.

180.    EEOC's mandate on gender identity in the workplace collectively resides in requirements published on its website, specific guidance published in

2024, and a history of enforcement actions. Together these are referred to herein as the EEOC Gender-Identity Mandate.

181.   EEOC has applied its Title VII interpretation to require employers to affirm and facilitate employees' gender transitions based on their purported gender identity, including requiring access to single-sex intimate spaces like restrooms, locker rooms, and lactation rooms, and requiring that employers use employees' self-selected pronouns.

182.   EEOC forces employers to not require male employees to comply with work rules for males based on gender identity and to not require female employees to comply with work rules for females, based on gender identity.

183.   EEOC prohibits employers from refusing to affirm or facilitate transition efforts, including by requiring employers to provide access to single-sex facilities based on gender identity and forcing them to use pronouns based on gender identity.

184.   Under *Bostock v. Clayton County*, 590 U.S. 644 (2020), Title VII prohibits hiring or firing an employee because he or she identifies as the opposite sex. But *Bostock* expressly disavows its application to other workplace situations such as an employer's private spaces like bathrooms. Nor does the *Bostock* decision address pronoun usage, harassment, dress code, or other speech in the workplace.

### A.    EEOC's Unlawful Website Actions on Gender Identity

185.   EEOC's website says that "[d]iscrimination against an individual because of gender identity, including transgender status, or because of sexual orientation is discrimination because of sex in violation of Title VII."[18]

---

[18] EEOC, Sex-Based Discrimination, https://perma.cc/EE2T-XRLA.

186. EEOC's website says that "it is illegal to discriminate … because of that person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy)."[19]

187. EEOC's website says that "[t]he law makes it illegal for an employer to make any employment decision because of a person's … sex (including gender identity, sexual orientation, and pregnancy)." *Id.*

188. EEOC's website says that "[t]he laws enforced by EEOC prohibit … neutral employment policies and practices that have a disproportionately negative effect on applicants or employees of a particular … sex (including gender identity, sexual orientation, and pregnancy), … if the polices or practices at issue are not job-related and necessary to the operation of the business." *Id.*

189. EEOC's website says that "[i]t is illegal to harass an employee because of … sex (including gender identity, sexual orientation, and pregnancy)." *Id.*

190. EEOC's website says that "[t]he law forbids sexual orientation and gender identity discrimination when it comes to *any* aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, and any other term or condition of employment."[20]

191. EEOC's website says that "employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity. In other words, if an employer has separate bathrooms, locker rooms, or showers for men and women, all men (including transgender men) should be allowed to use the men's facilities and all women (including transgender women) should be allowed to use the women's facilities." *Id.*

---

[19] EEOC, Prohibited Employment Policies/Practices, https://perma.cc/74GK-E4DS.

[20] EEOC, Sexual Orientation and Gender Identity (SOGI) Discrimination (emphasis added), https://perma.cc/3WMS-R7D4.

192.    EEOC's website says that "[i]t is unlawful to subject an employee to workplace harassment that creates a hostile work environment based on sexual orientation or gender identity." *Id*. "Harassment can … include, for example, offensive or derogatory remarks about a person's transgender status or gender transition." *Id*. So "using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment." *Id*. "Prohibiting a transgender person from dressing or presenting consistent with that person's gender identity would constitute sex discrimination." *Id*.

193.    EEOC's website says that "[s]ex discrimination involves treating someone (an applicant or employee) unfavorably because of that person's sex, including the person's sexual orientation, gender identity, or pregnancy."[21]

194.    Defendant Burrows issued a "technical assistance document" (the 2021 Guidance),[22] discussing the application of *Bostock* in all covered workplaces, and it required employers to treat employees according to their gender identity when accessing intimate spaces, using pronouns, and applying dress codes.

195.    A federal court vacated the 2021 Guidance, holding that the 2021 Guidance lacked statutory authority, exceeded EEOC rulemaking power, and skipped the APA's required notice-and-comment procedures. *Texas v. EEOC*, 633 F. Supp. 3d 824, 840–42, 847 (N.D. Tex. 2022). Another court concluded that the 2021 Guidance was invalid because the EEOC skipped notice-and-comment procedures. *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 839–40, 842 (E.D. Tenn. 2022).

---

[21] EEOC, Sex-Based Discrimination, *supra* note 18.

[22] EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity, https://perma.cc/V4ZX-636V.

**B.    EEOC's Unlawful Harassment Guidance on Gender Identity**

196.    In October 2023, EEOC proposed the 2024 Guidance through an announcement in the *Federal Register*, but EEOC did not publish the proposed guidance itself in the *Federal Register* when it requested comments.[23]

197.    On April 26, 2024, EEOC by a 3-2 vote issued more "enforcement guidance," effective on April 29, 2024 (the 2024 Guidance).[24]

198.    EEOC published the final 2024 Guidance on the internet, but EEOC did not publish the proposed or final 2024 Guidance in the *Federal Register*.

199.    The 2024 Guidance reads Title VII to require employers to treat employees according to their gender identities or else face liability.

200.    The 2024 Guidance imposes the same requirements as the 2021 Guidance that the federal court vacated as unlawful—applying to single-sex facilities, pronoun usage, and dress codes.[25]

201.    Under the 2024 Guidance, employers must allow any male employee who identifies as female to use the female bathrooms, locker rooms, and showers, and vice versa.

202.    Under the 2024 Guidance, employers must require employees to refer to any male employee who identifies as female using female pronouns, and vice versa.

203.    Under the 2024 Guidance, employers must allow any male employee who identifies as female to wear clothes complying with the dress code for females, and vice versa.

---

[23] Proposed Enforcement Guidance on Harassment in the Workplace, 88 Fed. Reg. 67,750 (Oct. 2, 2023); *see* https://perma.cc/KYA9-Z5RX.

[24] EEOC, Enforcement Guidance on Harassment in the Workplace (Apr. 29, 2024) [hereinafter 2024 Guidance], https://perma.cc/7V7L-PN7P; EEOC, Commission Votes: April 2024, https://perma.cc/G5V2-SJ2G.

[25] 2024 Guidance, *supra* note 24, at II.A.5.b & c.

204.    Under the 2024 Guidance, EEOC staff will investigate employers who do not make decisions about facilities, pronoun usage, and dress code for employees based on gender identity.

205.    The 2024 Guidance identifies itself as "the Commission's guidance on harassment in the workplace under EEOC-enforced laws. It communicates the Commission's position on important legal issues." *Id.* at Purpose.

206.    The 2024 Guidance "addresses how harassment based on … sex … is defined under EEOC-enforced statutes and the analysis for determining whether employer liability is established." *Id.* at Summary.

207.    The 2024 Guidance contains "Commission-approved enforcement guidance [which] presents a legal analysis of standards for harassment and employer liability applicable to claims of harassment under the equal employment opportunity (EEO) statutes enforced by the Commission, which prohibit work-related harassment based on … sex (including ... sexual orientation[ ] and gender identity).… This guidance serves as a resource for employers, employees, and practitioners; for EEOC staff and the staff of other agencies that investigate, adjudicate, or litigate harassment claims or conduct outreach on the topic of workplace harassment; and for courts deciding harassment issues." *Id.* at I.A.

208.    The 2024 Guidance says, "Sex-based discrimination under Title VII includes discrimination based on ... gender identity [citing *Bostock*]. Accordingly, sex-based harassment includes harassment based on ... gender identity, including how that identity is expressed." *Id.* at II.A.5.c.

209.    The 2024 Guidance describes prohibited "harassing conduct." *Id.* One example of what the Guidance defines as harassing conduct and discriminatory action is an employer's "denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." *Id.* Another is "use of a

name or pronoun inconsistent with the individual's known gender identity (misgendering)." *Id.*

210.    The 2024 Guidance provides examples of prohibited harassment based on gender identity. Those examples include employers using biologically accurate pronouns and employers applying sex-specific attire requirements. *Id.*

211.    The 2024 Guidance says that an employee can establish a claim for hostile work environment because of the employee's "protected characteristic" through stereotyping or some combination of context, timing, and comparative evidence. *See id.* at II.B.1–5.

212.    In support of its 2024 Guidance, EEOC cited past administrative appeals decisions and district court cases to say that calling an employee by something other than his or her preferred pronoun or denying individuals access to sex-segregated spaces that correspond with their gender identity constitutes harassment. *Id.* at II.A.5.c & n.42.

### C.    EEOC's unlawful enforcement actions on gender identity

213.    EEOC has brought enforcement actions seeking to force employers to affirm transition efforts or to treat an employee as the opposite sex based on gender identity, including in access to intimate spaces and pronoun usage.[26]

---

[26] *See, e.g.*, *EEOC Sues Boxwood and Related Hotel Franchises for Discriminating Against Transgender Employee* (Sept. 26, 2024), https://perma.cc/P2QF-TNSF ("Misgendering and Anti-Transgender Comments"); *EEOC Sues Reggio's Pizza for Retaliation* (Sept. 25, 2024), https://perma.cc/8PKT-PW53 ("misgendering"); *EEOC Sues Two Employers for Sex Discrimination* (June 13, 2024), https://perma.cc/4PS8-A8UR (seeking to impose liability for employment actions taken "after management observed him styled and dressed in a manner they perceived to be feminine and that differed from management's preferred appearance for male employees"); *Columbia River Healthcare to Settle EEOC Harassment Charge* (May 23, 2024), https://perma.cc/Z3SY-6JSK (seeking to impose liability for treatment of a supervisor after "managers and staff persisted in repeatedly and intentionally referring to them using pronouns inconsistent with their gender identity"); *EEOC*

214.   In October 2024, EEOC sued a restaurant chain for "misgendering, deadnaming (using a name a person no longer uses against their wishes) and publicizing [an employee's] birth name without consent."[27]

215.   The same month EEOC sued another restaurant for "subjecting the transgender employees to misgendering" and "unequal access to bathrooms."[28] An EEOC official commented, "Just as employers should not tolerate the use of racial slurs in the workplace, they must also prohibit misgendering and 'deadnaming' their transgender employees." *Id*.

216.   EEOC reports that in fiscal year 2023, "EEOC received more than 3,000 charges alleging discrimination based on sexual orientation or gender identity, the most since the agency started tracking these charges in FY 2013, and up more than 36% from the previous year." *Id*.

### D.     The EEOC Gender-Identity Mandate's compliance costs

217.   Under Title VII, employers are required to have adequate training materials and procedures for reporting unlawful harassment.

---

*Sues Sis-Bro, Inc. for Gender Identity Discrimination and Harassment* (Mar. 28, 2024), https://perma.cc/H4TB-E6HC (seeking to impose liability for making "frequent, derogatory comments about the targeted employee's gender identity;" refusing "to call the targeted employee by her name and refer[ing] to her by her former name;" telling "her she was 'a guy;'" and "criticiz[ing] her use of employer-provided health insurance and leave for gender affirming care."); *Deluxe Financial to Settle Sex Discrimination Suit on Behalf of Transgender Employee* (Jan. 21, 2016), https://perma.cc/KM8W-M49S (restroom access and pronoun usage).

[27] *EEOC Sues Culver's for Discriminating Against Transgender Employee and Retaliating Against Him and His Co-Workers* (Oct. 25, 2024), https://perma.cc/425R-LBWR (describing *EEOC v. Brik Enters., Inc.*, Case No. 24-cv-12817 (E.D. Mo. filed Oct. 25, 2024)).

[28] *EEOC Sues Two Employers for Sex Discrimination*, https://perma.cc/YAN2-H9SR (describing *EEOC v. Starboard Group, Inc.*, Case 3:24-cv-02260 (S.D. Ill. filed Oct. 1, 2024)).

218.    Under the 2024 Guidance, an employer must take affirmative steps to prevent and correct violations of the EEOC Gender-Identity Mandate. According to EEOC, this can "usually" be accomplished by "promulgating a policy against harassment, establishing a process for addressing harassment complaints, providing training to ensure employees understand their rights and responsibilities, and monitoring the workplace to ensure adherence to the employer's policy."[29]

219.    Employers need to devote significant time and resources to creating or updating policies, establishing processes, creating and providing training, and monitoring the workplace.

220.    Rapides Parish School Board and its schools have more than fifteen employees and are subject to Title VII.

221.    To comply with EEOC's mandates, Rapides Parish School Board would need to devote significant time and resources to creating or updating policies, processes, training, and monitoring programs. At a minimum, this would require several hours of employee time, imposing costs well above $1,000 of lost employee value per company.

## VII.    Rapides Parish School Board's Funding

### A.    Head Start

222.    Rapides Parish School Board and its schools receive about $9.3 million annually in Head Start funds from HHS.

223.    The school board has a website that allows parents to apply for Head Start or Early Head Start.[30]

---

[29] 2024 Guidance, *supra* note 24, at IV.C.2.b.i.

[30] Rapides Early Childhood Network, Rapides Early Childhood Network Enrollment Application, https://www.rapidesearlychildhoodnetwork.com/headstart-application (last visited Jan. 15, 2025).

224.    The school board has seven current Head Start locations.[31]

225.    This program serves children from infant (under 1) to pre-kindergarten (ages 3–4).[32]

226.    HHS threatens to take away all this funding under the Head Start Mandate and the Section 504 Rule.

**B.    Medicaid**

227.    Rapides Parish School Board and its schools receive about $1.2 million annually (regular and reimbursement) from HHS in Medicaid funds.

228.    HHS with the State of Louisiana funds the Louisiana School-based Medicaid Program (SBMP).

229.    This program covers

- nursing and medical services;

- therapy services (occupational therapy, physical therapy, speech language audiology services);

- behavioral health services including applied behavioral analysis services;

- personal care services (1:1 child specific aides that are required for students to participate in the activities of daily living); and

---

[31] Rapides Early Childhood Network, Head Start/Early Head Start, https://www.rapidesearlychildhoodnetwork.com/headstart-early-headstart (last visited Jan. 15, 2025).

[32] *See, e.g.*, Rapides Early Childhood Network, McKeithen, https://www.rapidesearly childhoodnetwork.com/head-start-mckeithen (last visited Jan. 15, 2025).

- transportation (i.e., transporting students on specially adapted vehicles to and from school).[33]

230. All students who are enrolled in Medicaid are eligible for SBMP services. *Id.* at 2.

231. SBMP reimburses school boards for the cost of providing these health services in schools including salaries, benefits, and indirect costs associated with the health services. *Id.* at 3.

232. For a local education agency like the school board to bill Medicaid, it must first be approved as a Medicaid provider and sign the required Medicaid provider agreements.[34]

233. The school board receives HHS funding as a Medicaid provider in the Louisiana School-based Medicaid Program.

234. HHS threatens to take away all this funding under the Section 1557 Rule and the Section 504 Rule.

**C.    The School Lunch Program**

235. Rapides Parish School Board and its schools receive about $13.2 million annually from USDA for school meal programs including school lunches.

236. The school board participates in USDA's National School Lunch Program (NSLP), School Breakfast Program, Child and Adult Care Food Program,

---

[33] La. Dep't of Educ., *Louisiana School Based Medicaid Program 101* at 2,4 (May 1, 2024), https://doe.louisiana.gov/docs/default-source/public-school/sbmp-medicaid-101.pdf.

[34] La. Dep't of Educ., *SBMP–LEA Registration as a Medicaid Provider* at 1, https://doe.louisiana.gov/docs/default-source/public-school/sbmp---lea-registration-as-a-medicaid-provider.pdf.

Summer Food Service Program, Fresh Fruit and Vegetable Program, Afterschool Snack Program, and USDA Foods Program, among others.[35]

237.    For the 2024-2025 school year, and going back to 2019, all students in the district receive free breakfast and lunch because of low-income levels in the community.[36] This eligibility provision ensures that no student is turned away from the lunch line for lack of funds.

238.    The school board publishes the daily breakfast and lunch menu on the front page of its website for families and students.[37] Monthly menus are also available. For example, on a typical day, Thursday, January 30, the planned breakfast is waffle/sausage/syrup with fruit and milk, and the planned lunch is chicken or turkey & sausage gumbo with candied yams, cornbread or crackers, a fruit cup, and milk.[38]

239.    The school board also offers students free breakfast and lunch during the summer.[39]

240.    The school board's Food & Nutrition Services Department helps ensure that students have adequate access to nutritious foods. As the school board's website explains, "Meeting this basic need is essential to their establishment of a

_____

[35] Rapides Parish School Board, Food and Nutrition Services, https://www.rpsb.us/foodservice (last visited Jan. 17, 2025).

[36] Mary Helen Downey, *All RPSB Students to Receive Free Breakfast & Lunch for 2024-2025 School Year*, KALB5 (June 17, 2024, 4:28 PM PDT), https://www.kalb.com/2024/06/17/all-rpsb-students-receive-free-breakfast-lunch-2024-2025-school-year/.

[37] Rapides Parish Schools, https://www.rpsb.us/ (last visited Jan. 17, 2025).

[38] Rapides Parish School Board, Food & Nutrition Services (Future Website), https://new.rpsb.us/departments/food-nutrition-services (last visited Jan. 17, 2025). The school board is currently in the process of building a new website.

[39] Rapides Parish School Board, Summer Meal Sites, https://www.rpsb.us/summer-meal-sites (last visited Jan. 15, 2025).

healthy eating pattern and development of a strong foundation for academic achievement."[40]

241.    The Food & Nutrition Services Department has eight dedicated staff members, including a registered dietitian, along with each school's cafeteria staff.[41]

242.    The school board seeks to treat every student with dignity and respect. The school would never turn away a hungry child.

243.    The school's website lists its current USDA nondiscrimination policy:

**Non-discrimination Statement:** This explains what to do if you believe you have been treated unfairly. "In accordance with Federal Law and U.S. Department of Agriculture policy, this institution is prohibited from discriminating on the basis of race, color, national origin, sex, age or disability. To file a complaint of discrimination, write USDA Director, Office of Adjudication, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call toll free (866) 632-9992 (VOICE). Individuals who are hearing impaired or have speech disabilities may contact USDA through the Federal Relay Service at (800) 877-8339; or (800) 845-6136 (Spanish). USDA is an equal opportunity provider and employer".[42]

244.    USDA threatens to take away all of this funding under the USDA School Lunch Gender-Identity Mandate.

**D.    The hardship imposed by the federal gender-identity mandates**

245.    It would cause the school board significant financial harm to lose eligibility for these federal programs.

---

[40] Rapides Parish School Board, Food & Nutrition Services (Future Website), *supra* note 38.

[41] Rapides Parish School Board, Food and Nutrition Services, *supra* note 35.

[42] Rapides Parish School Board, Food & Nutrition Services (Future Website), *supra* note 38.

246.    If the school board lost federal funding, it would have to cancel these programs and services unless it could secure new funding, which might not be possible.

247.    Even if new funding could be obtained, the school board would likely have to pause these services and programs for an undetermined period of time while obtaining new funding.

## VIII.  The School Board's Policies Do Not Encompass Gender Identity.

248.    The school board has adopted its policies and practices and built facilities relying on its understanding that the prohibition on discrimination based on sex in Title IX and other federal statutes means biological sex.

249.    The school board objects to changing its policies and practices, adopting new policies and practices, or altering its speech in response to the gender-identity mandates challenged in this case.

250.    The school board does not post, and it objects to posting, posters stating that the school board complies with the USDA's gender-identity mandates.

### A.    The school board has sex-specific athletics and P.E. classes.

251.    Rapides Parish schools offer extracurricular activities, including interscholastic athletics. Many school sports teams are sex-specific. For example, Rapides Parish high schools field separate boys' and girls' teams for basketball, cross country, powerlifting, soccer, swimming, and track.

252.    The school board complies with Louisiana law, including the Fairness in Women's Sports Act.

253.    Under Louisiana's Fairness in Women's Sports Act (Fairness Act), "[e]ach intercollegiate or interscholastic athletic team or sporting event that is sponsored by a school and that receives state funding shall be expressly designated, based upon biological sex, as only one of the following:

(1) … [A] male, boys, or mens team or event shall be for those students who are biological males.

(2) A female, girls, or womens team or event shall be for those students who are biological females.

(3) A coeducational or mixed team or event shall be open for participation by biological females and biological males.

La. Stat. Ann. § 4:444(A) (2022).

254.    The Fairness Act specifies that "[a]thletic teams or sporting events designated for females, girls, or women shall not be open to students who are not biologically female." *Id.* § 4:444(B).

255.    The Fairness Act provides a private cause of action for any "biological female student who is deprived of an athletic opportunity or suffers or is likely to suffer from any direct or indirect harm as a result of a violation," or "who is subjected to retaliation or other adverse action by a school, athletic association, or other organization as a result of reporting a violation." *Id.* § 4:446(A), (B).

256.    The Fairness Act also provides a cause of action for "[a] school, school coach, school employee, school board, school board employee, school board member, postsecondary education board, or postsecondary education board member who suffers any direct or indirect harm for prohibiting a biological male from participating in a female, girls, or womens athletic team or sporting event pursuant to the requirements of [the Fairness Act]." *Id.* § 4:446(D).

257.    Relief under the Fairness Act includes but is not limited to "(1) [i]njunctive relief, protective order, writ of mandamus or prohibition, or declaratory relief to prevent any violation of [the Fairness Act]" and "(2) actual damages, reasonable attorney's fees, and costs." *Id.* § 4:446(E).

258.    Seventh through twelfth grade physical education (P.E.) classes at Rapides Parish school campuses are sex-specific P.E. classes that regularly include contact sports, such as basketball and soccer.

259.    The school board is aware of at least five current students at its high schools, six students at its middle schools, and two students at its elementary schools who have professed a gender identity that differs from their sex. One of these identifies as "nonbinary."

260.    The school board's practice is that all students, including those who profess a gender identity that differs from their sex, participate in school activities based on sex. For example, the school board would not enroll a male student in a girls' P.E. class, even if the male student self-identified as a girl.

**B.    The school board has sex-specific private facilities.**

261.    Rapides Parish schools separate private spaces by sex—meaning biological sex. Males are not allowed access to the girls' locker rooms, restrooms, or showers. Likewise, females are not allowed access to the boys' locker rooms, restrooms, or showers.

262.    The school board's high school campuses have separate girls' and boys' gymnasia.

263.    Rapides Parish schools have communal restrooms and locker rooms rather than single-occupant facilities. No school campus has enough single-occupant restrooms or changing spaces for use by the entire student body.

264.    The school board's practice is that all individuals—including students and staff—use sex-designated private facilities (such as restrooms, locker rooms, or changing rooms) based on biological sex. Facilities designated for "men" or "boys" may be used by biological males only. Facilities designated for "women" or "girls" may be used by biological females only.

265.    The school board does not have and does not intend to adopt a policy mandating that staff or students ensure employee or student access to single-sex private spaces (like restrooms and locker rooms) based on gender identity.

C.    **The school board's other policies reflect the differences between male and female.**

266.    The school board's employee conduct policy states: "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in pre-kindergarten through grade 12 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards."

267.    Many of the school board's policies rely on biological distinctions between male and female. For example, any search of a student's person must be done by a teacher or administrator "of the same sex as the student to be searched, and sometimes in the presence of "[a] witness of the same sex."

268.    The school board does not have and does not intend to adopt a policy mandating that staff or students use pronouns that reflect employees' or students' perceived gender identity when doing so conflicts with sex.

IX.    **The Gender-Identity Mandates Would Radically Transform Rapides Parish School Board Policy to the Detriment of Students.**

A.    **The HHS and USDA school lunch mandates would force the school board to let males play in female sports.**

269.    The HHS and USDA school lunch mandates harm the school board's athletic programs and female athletes by forcing schools to allow students to participate on sex-specific sports teams and in girls' P.E. classes according to gender identity—undermining the privacy and safety of girls. Females must compete against males who identify as girls for spots on their school's teams and then compete against males on opposing schools' female athletic teams.

270.    To comply, the school board will have to spend time and resources changing its existing policy and practice of complying with all Louisiana laws, including Louisiana's Fairness Act. *See* La. Stat. Ann. § 4:441–46.

271.    HHS and USDA threaten to require the school board to violate state athletics law as a condition of receiving any federal funds. This conflict forces the school board to choose between, on the one hand, following what each agency appears to demand on sports in violation of Louisiana law and, on the other hand, ignoring what each agency says to comply with Louisiana law. Either way, the school board would be harmed.

272.    Disregarding the Fairness Act threatens the board's state funds— funds that make up the bulk of the board's annual budget—and subjects the school board to private lawsuits under the Fairness Act. *See* La. Stat. Ann. § 4:446.

273.    Congress lacks the authority under the Spending Clause to preempt state law. An agency may not pay anyone to violate state law. Instead, if state law prevents the spending of federal funds in a certain way, the only thing an agency may do is disallow funds.

**B.    The agency gender-identity mandates would force the school board to allow males to access females' single-sex private facilities.**

274.    The agency gender-identity mandates force the school board to allow employees and students to access sex-specific private spaces like locker rooms according to their gender identity—which eliminates sex separation in those spaces. The presence of opposite-sex students or staff in these spaces deprives children of privacy and threatens their personal sense of safety and security, as well as their access to equal educational opportunity.

275.    To comply, the school board will have to spend time and resources changing its existing practice that separates restroom, locker room, and shower facilities by sex. Under current practice, males are not allowed to enter the girls' locker rooms, restrooms, or showers; likewise, females are not allowed to enter the boys' locker rooms, restrooms, or showers.

276.    The federal government would require the school to allow students and adults, such as parent volunteers, chaperones, teachers, and coaches, to access private spaces consistent with their gender identities. That mandate harms students and adults forced to share private spaces with a person of the opposite sex.

277.    To comply, the school board will have to spend time and resources changing its existing field trip policy, which says that "any field trips consisting of boys and girls and requiring them to stay overnight must be chaperoned by faculty, staff, or parents of both sexes." The school board will also have to change its policy and practice of housing males and females separately on such trips. The school board does not allow a biological male who identifies as a female to house with female students on such a trip, or vice versa. The field trip policy would need to account for students or chaperones who identify as a gender identity different from their sex, such as a student's father who identifies as a woman. The federal government seemingly would require the school to place this chaperone in a room of girls. That situation would not be tolerable to the school board and could expose the school board to liability.

278.    The school board will have to spend time and resources changing its policy that any search of a student's person must be done by a teacher or administrator "of the same sex as the student to be searched," and at times in the presence of "[a] witness of the same sex." Otherwise, a girl who identifies as a boy would have her person searched by an adult male and the search witnessed by another adult male. Such situations would be intolerable to the school board and could also expose the board to liability. But if the board adopted a search policy for students who identify as transgender different from the one that applies to other students, the board risks federal liability for sex discrimination.

279.    The school board will have to spend time and resources changing its existing dress-code policy that is different for "girls" than for "boys." The board

would need to amend this policy to clarify how it applies to students who identify as a gender contrary to their sex or as non-binary. The federal government arguably would require the board to permit students who identify as non-binary to choose which dress code applies to them even though other students lack that option.

280.    The school board is aware of at least thirteen students who have identified as a gender identity that differs from their sex. Under the agency gender-identity mandates, the school board must immediately allow these students to participate in school programs and activities consistent with their gender identity.

281.    At a minimum, the mandates will require that these students immediately be allowed to use opposite-sex locker rooms, restrooms, and other sex-designated spaces, to enroll in P.E. classes, to dress, and to be referred to with pronouns consistent with their gender identity.

### C.    The agency gender-identity mandates infringe on free speech and constitutional rights.

282.    The five agency gender-identity mandates threaten the school board with liability for sex-based harassment or discrimination unless the school board enacts policies or practices that compel teachers, staff, and students to speak consistent with the administration's preferred view about the nature of sex.

283.    The school board will have to spend time and resources changing its policies that use the term "gender" as a synonym for "sex," reflecting the board's understanding that both terms refer to the same concept: biological sex.

284.    The school board will have to spend time and resources changing its policies that currently reflect Title IX's use of the term "sex" to mean the biological binary between males and females. For example, one policy states that "*[m]ale and female students must be eligible for benefits, services, and financial aid without* discrimination on the basis of sex."

285.    The school board will have to spend time and resources changing its employee conduct policy that states: "classroom instruction … on sexual orientation or gender identity may not occur in pre-kindergarten through grade 12 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards."

286.    The school board will have to spend time and resources adopting policies or practices that compel teachers, staff, and students to use opposite-sex pronouns or names.

287.    Under the agency gender-identity mandates, students and employees would not be free to express the view that sex is binary or to speak against the practice of transitioning a child to a gender identity that does not conform with his or her sex.

288.    An employee or student's refusal to participate in a social transition through speech is constitutionally protected.

289.    Because the federal government requires the school board to treat protected expression as if it were sex-based harassment, the federal government would force the school board to amend its policies to violate the constitutional rights of staff and students, to censor and compel speech, and to chill wide swaths of protected speech, including through self-censorship.

290.    If the school board were to comply with the agency gender-identity mandates, the school board would face liability for threatening employees' and students' constitutional rights and the school board would risk losing students to private schools that need not comply with the agency gender-identity mandates.

## X.    The School Board's Need for Judicial Relief

291.    Failure to follow the agency gender-identity mandates and their interpretation of federal law risks the burdens and costs of federal investigations

and enforcement proceedings as well as liability for the school board under a cause of action in civil litigation, including in suits brought by private individuals.

292.    Failure to follow the HHS and USDA School Lunch Gender-Identity Mandates and their interpretation of federal law risks disallowance, exclusion, suspension, and debarment from receipt of federal funding.

293.    All the acts of Defendants, and their officers, agents, employees, and servants, are and were executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the United States.

294.    The APA allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702.

295.    Each Defendant Department is an "agency" under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

296.    Each agency mandate is a "rule" under the APA, is a legislative or substantive rule, and is a reviewable "final agency action." 5 U.S.C. §§ 551(4), 704.

297.    Each agency mandate is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. No statute precludes judicial review, and no agency mandate is committed to agency discretion by law under 5 U.S.C. § 701(a).

298.    The agency gender-identity mandates are definitive and determine the rights and obligations of persons, including the school board.

299.    Each agency declares that its mandate reflects the full force of law.

300.    Absent injunctive and declaratory relief, the school board has been and will continue to be harmed.

301.    The school board's compliance costs will impose both one-time and ongoing financial harms.

302.    On top of having standing to vindicate its own interests, the school board has third-party standing to vindicate its employees' and students' rights. The school board shares a close relationship with its employees and students and can effectively advocate for their rights. Employees and students face obstacles that bar them from effectively advocating for their First Amendment rights. Among other things, asserting their First Amendment rights on the hotly charged issue of gender identity subjects them to harassment and ostracization.

303.    The school board has no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I
### HHS Head Start Gender-Identity Mandate
### Administrative Procedure Act
### (5 U.S.C. § 706; 28 U.S.C. § 2201; Ultra Vires and Unconstitutional)

304.    The school board incorporates by reference paragraphs 1–303.

305.    The HHS Head Start Mandate as referred to herein is most recently codified at 2 C.F.R. § 300.300.

306.    To the extent relief afforded by this Court against 2 C.F.R. § 300.300 reverts HHS's rules back to previous iterations of a similar gender-identity mandate, such as those codified at 45 C.F.R. § 75.300 through the 2016 Grants Rule, the 2024 Grants Rule, and/or the OMB Grants Rule, this claim also runs against those rules as well.

307.    The HHS Head Start Mandate is unlawful and must be "set aside" because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(D).

### A.    Statutory Violations

308.    The HHS Head Start Mandate is contrary to law and in excess of statutory authority.

309.    42 U.S.C. § 9849 does not define "sex" to mean gender identity. Congress intended "sex" to mean the biological difference between male and female.

310.    Recognition of physiological differences between the sexes does not violate 42 U.S.C. § 9849. Sex-specific facilities can prevent unlawful harassment.

311.    The HHS Head Start Mandate unlawfully seeks to elevate the category of "gender identity" (absent from the 42 U.S.C. § 9849) over sex (actually protected under the 42 U.S.C. § 9849).

312.    Section 9849 does not require gender-identity accommodations.

313.    Substantive canons of statutory construction and the major questions doctrine preclude reading statutory references to "sex" to include "gender identity" that differs from a person's biology.

314.    Congress has not delegated to Defendants authority to prohibit gender-identity discrimination as they have done in the HHS Head Start Gender-Identity Mandate.

### B.    Procedural Violations

315.    The HHS Head Start Mandate lacks the personal signed approval of the President or the Attorney General, and thus cannot go into effect until the President or the Attorney General approves it.

316.    Under 42 U.S.C.A. § 2000d-1, the HHS Head Start Mandate is not effective, and cannot be effective, until approved by the President or authorized delegate. 20 U.S.C. § 1682.

317.   Under 3 U.S.C. § 301, this authority was delegated to the Attorney General but not to other HHS or DOJ officials. Executive Order 12250 § 1-1, 45 Fed. Reg. 72995 (Nov. 2, 1980) (also set out as a note under 42 U.S.C. § 2000d-1).

318.   The HHS Head Start Mandate is a substantive rule but did not undergo notice and comment consistent with the APA because HHS used interim final rulemaking and did not publish the text of its proposed adoption in the *Federal Register* as required by the APA, allow or consider public comment, delay the effective date by 30 days, or have good cause to skip the APA's procedures. 5 U.S.C. §§ 552(a)(l)(D), 553.

319.   Even if the HHS Head Start Mandate or parts of it were not a substantive rule, HHS was still required to publish the complete text in the *Federal Register* because the mandate is a "statement[ ] of general policy or interpretation[ ] of general applicability formulated and adopted by the agency." *Id*. § 552(a)(l)(D).

## C.    Arbitrary and Capricious

320.   In drafting and promulgating the HHS Head Start Mandate, HHS failed to undergo reasoned decision-making.

321.   HHS did not adequately consider important issues or consider alternative policies.

322.   HHS failed to define key terms such as "gender identity."

323.   HHS failed to adequately consider that sex is a biological reality and that biological sex differences are not sex stereotypes.

324.   HHS failed to adequately consider the impact of its rule on schools and the harm that comes to students and employees when schools ignore or misconstrue the biological differences between the sexes.

325.   HHS failed to adequately consider female employees and students whose rights of privacy, equality, and safety are threatened by allowing males into

female single-sex programs, such as athletics and P.E. classes, and single-sex spaces such as restrooms, locker rooms, and overnight accommodations.

326.    HHS failed to adequately consider the burden on employees who cannot use self-selected pronouns based on gender identity, or who cannot otherwise treat employees as the opposite sex, such as with dress codes.

327.    HHS failed to adequately consider schools' reliance interests in maintaining sex-specific athletic teams and P.E. classes, in keeping sex-specific policies and facilities, and in respecting free-speech, parental, and other rights.

328.    HHS failed to adequately quantify compliance costs.

329.    HHS failed to adequately consider alternative policies, such as (1) taking no action; (2) creating regulations to protect single-sex programs and facilities, female equality, free speech, parental rights, and privacy rights under the correct understanding of the law; (3) grandfathering existing categories of programs and practices covered by Title IX and other statutes; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

330.    HHS based its rule on a misreading of *Bostock* that is not supported by the limitations expressly laid out in that decision.

### D.    Constitutional Violations

331.    The HHS Head Start Mandate violates the Spending Clause.

332.    The public and States lacked the constitutionally required clear notice that the statutes would apply in this way when Congress passed them and when funding grants were made.

333.    The HHS Head Start Mandate improperly seeks to use a Spending Clause statute to preempt traditional state authority and laws.

334.    The HHS Head Start Mandate forces the school board to violate the free speech rights of employees and students under the First Amendment by

adopting policies that restrict and compel school board, employee, and student speech.

335.    The HHS Head Start Mandate requires the school board, employees, and students to use self-selected pronouns that are different from an individual's biological sex and to change employment policies governing speech, in violation of the First Amendment.

336.    The HHS Head Start Mandate is so vague and overbroad that it will chill protected expression.

337.    The HHS Head Start Mandate does not further a compelling or substantial governmental interest, is not narrowly tailored to achieve any governmental interest, and cannot satisfy First Amendment scrutiny.

## COUNT II
### HHS Section 1557 Rule
### Administrative Procedure Act
### (5 U.S.C. § 706; 28 U.S.C. § 2201; Ultra Vires and Unconstitutional)

338.    The school board incorporates by reference paragraphs 1–303.

339.    HHS's Section 1557 Rule is unlawful and must be "set aside" because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(D).

### A.    Statutory Violations

340.    The Section 1557 Rule is contrary to law and in excess of statutory authority.

341.    The Rule exceeds the authority of Section 1557, the Affordable Care Act, Title IX of the Education Amendments of 1972, and Section 504 of the Rehabilitation Act.

342.    Neither Section 1557 nor Title IX which it incorporates prohibit discrimination on the basis of gender identity or require accommodations based on gender identity.

343.    Neither Section 1557 nor Title IX define "sex" as encompassing gender identity.

344.    Congress used sex and sex discrimination in both statutes to mean the biological difference between male and female.

345.    Recognition of physiological differences between the sexes does not violate Section 1557 or Title IX, but rather is often needed to ensure equal opportunities and prevent unlawful harassment.

346.    By requiring Plaintiff Rapides Parish School Board to allow males access to female programs and spaces, Defendants have violated their obligation under Section 1557 and Title IX to provide equal treatment, benefits, and opportunities in education to girls.

347.    Substantive canons of statutory construction and the major questions doctrine preclude reading statutory references to "sex" to include "gender identity" that differs from a person's biology.

348.    HHS lacks any authority to impose disparate-impact liability under Section 1557.

349.    The 1557 Rule exceeds the authority of other statutory provisions, including 29 U.S.C. § 705(20)(F)(i), Section 1554 of the ACA, 42 U.S.C. § 18114, to 42 U.S.C. § 18116(a), to 42 U.S.C. § 18122(1), (2)(A), (3), and to Sections 1102 and 1902(a)(4) of the SSA (42 U.S.C. §§ 1302, 1396a(a)(4).

### B.    Arbitrary and Capricious

350.    In drafting and promulgating the Section 1557 rule, HHS failed to undergo reasoned decision-making.

351.    HHS did not adequately consider important issues or consider alternative policies.

352.    HHS failed to define key terms such as "gender identity."

353.    HHS failed to adequately consider that sex is a biological reality and that biological sex differences are not sex stereotypes.

354.    HHS failed to adequately consider the impact of its rule on schools, and the harm that comes to students and employees when schools ignore or misconstrue the biological differences between the sexes.

355.    HHS failed to adequately consider female employees and students whose rights of privacy, equality, and safety are threatened by allowing males into female single-sex programs, such as athletics and P.E. classes, and single-sex spaces such as restrooms, locker rooms, and overnight accommodations.

356.    HHS failed to adequately consider the burden on employees who cannot use self-selected pronouns based on gender identity, or who cannot otherwise treat employees as the opposite sex, such as with dress codes.

357.    HHS failed to adequately consider schools' reliance interests in maintaining sex-specific athletic teams and P.E. classes, in keeping sex-specific policies and facilities, and in respecting free-speech, parental, and other rights.

358.    HHS failed to adequately quantify compliance costs.

359.    HHS failed to adequately consider alternative policies, such as (1) taking no action; (2) creating regulations to protect single-sex programs and facilities, female equality, free speech, parental rights, and privacy rights under the correct understanding of the law; (3) grandfathering existing categories of programs and practices covered by Title IX and other statutes; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

360.    HHS based its rule on a misreading of *Bostock* that is not supported by the limitations expressly laid out in that decision.

### C.    Constitutional Violations

361.    The Section 1557 Rule violates the Spending Clause.

362.    The public and States lacked the constitutionally required clear notice that Section 1557 and Title IX would apply in this way when Congress passed them and when federal funding first occurred.

363.    The Section 1557 rule improperly seeks to use a Spending Clause statute to preempt traditional state authority and laws.

364.    The Section 1557 rule forces the school board to violate the free speech rights of employees and students under the First Amendment by adopting policies that restrict and compel school board, employee, and student speech.

365.    The Section 1557 rule requires the school board, employees, and students to use self-selected pronouns that are different from an individual's biological sex, and to change employment policies governing speech, in violation of the First Amendment.

366.    The Section 1557 rule is so vague and overbroad that it will chill protected expression.

367.    The Section 1557 rule does not further a compelling or substantial governmental interest, is not narrowly tailored to achieve any governmental interest, and cannot satisfy First Amendment scrutiny.

### COUNT III
### HHS Section 504 Rule
### Administrative Procedure Act
### (5 U.S.C. § 706; 28 U.S.C. § 2201; Ultra Vires and Unconstitutional)

368.    The school board incorporates by reference paragraphs 1–303.

369.    HHS's Section 504 Rule is unlawful and must be "set aside" because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(D).

A.     **Statutory Violations**

370.     The Section 504 Rule is contrary to law and in excess of statutory authority, as is HHS and DOJ enforcement of their misunderstanding of Section 504.

371.     Section 504 does not prohibit discrimination on the basis of gender identity or require accommodations based on gender identity.

372.     Section 504 does not encompass gender dysphoria, gender identity, or transgender status within disability.

373.     Recognition of differences between the sexes does not violate Section 504.

374.     Substantive canons of statutory construction and the major questions doctrine preclude twisting "disability" in Section 504 to include "gender dysphoria" or to include gender identity discrimination within disability discrimination.

375.     Congress has not delegated to HHS authority to prohibit gender-identity discrimination as it has done in the Section 504 Rule.

B.     **Arbitrary and Capricious**

376.     In drafting and promulgating the Section 504 Rule, HHS failed to undergo reasoned decision-making.

377.     HHS did not adequately consider important issues or consider alternative policies.

378.     HHS failed to define key terms such as "gender identity."

379.     HHS failed to adequately consider that sex is a biological reality and that biological sex differences are not sex stereotypes.

380.    HHS failed to adequately consider the impact of its rule on schools, and the harm that comes to students and employees when schools ignore or misconstrue the biological differences between the sexes.

381.    HHS failed to adequately consider female employees and students whose rights of privacy, equality, and safety are threatened by allowing males into female single-sex programs, such as athletics and P.E. classes, and single-sex spaces such as restrooms, locker rooms, and overnight accommodations.

382.    HHS failed to adequately consider the burden on employees who cannot use self-selected pronouns based on gender identity, or who cannot otherwise treat employees as the opposite sex, such as with dress codes.

383.    HHS failed to adequately consider schools' reliance interests in maintaining sex-specific athletic teams and P.E. classes, in keeping sex-specific policies and facilities, and in respecting free-speech, parental, and other rights.

384.    HHS failed to adequately quantify compliance costs.

385.    HHS failed to adequately consider alternative policies, such as (1) taking no action; (2) creating regulations to protect single-sex programs and facilities, female equality, free speech, parental rights, and privacy rights under the correct understanding of the law; (3) grandfathering existing categories of programs and practices covered by Title IX and other statutes; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

### C.    Constitutional Violations

386.    The Section 504 Rule violates the Spending Clause.

387.    The public and States lacked the constitutionally required clear notice that Section 504 and Section 1557 would apply in this way when Congress passed them or when federal funding first occurred.

388.    The Section 504 Rule improperly seeks to use a Spending Clause statute to preempt traditional state authority and laws.

389.    The Section 504 Rule forces the school board to violate the free speech rights of employees and students under the First Amendment by adopting policies that restrict and compel school board, employee, and student speech.

390.    The Section 504 Rule requires the school board, employees, and students to use self-selected pronouns that are different from an individual's biological sex, and to change employment policies governing speech, in violation of the First Amendment.

391.    The Section 504 Rule is so vague and overbroad that it will chill protected expression.

392.    The Section 504 Rule does not further a compelling or substantial governmental interest, is not narrowly tailored to achieve any governmental interest, and cannot satisfy First Amendment scrutiny.

## COUNT IV
### USDA School Lunch Gender-Identity Mandate
### Administrative Procedure Act
### (5 U.S.C. § 706; 28 U.S.C. § 2201; Ultra Vires and Unconstitutional)

393.    The school board incorporates by reference paragraphs 1–303.

394.    The USDA's School Lunch Gender-Identity Mandate is unlawful and must be "set aside" because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(D).

## A.    Statutory Violations

395.    The USDA School Lunch Gender-Identity Mandate is contrary to law and in excess of statutory authority.

396.    Title IX, from which the mandate purports to derive, does not prohibit discrimination on the basis of gender identity or require accommodations based on gender identity.

397.    Title IX does not define "sex" as encompassing gender identity and Congress intended "sex" to mean the biological difference between male and female.

398.    Recognition of physiological differences between the sexes does not violate Title IX. Sex-specific facilities can ensure equal opportunities and prevent unlawful harassment.

399.    By providing males the opportunity to access female spaces and programs, Defendants have violated their obligation under Title IX to provide equal treatment, benefits, and opportunities in education to girls.

400.    Substantive canons of statutory construction and the major questions doctrine preclude reading statutory references to "sex" to include "gender identity" that differs from a person's biology.

401.    Congress has not delegated to USDA authority to prohibit gender-identity discrimination as it has done in the USDA School Lunch Gender-Identity Mandate.

## B.    Procedural Violations

402.    The USDA School Lunch Gender-Identity Mandate is a substantive rule but it did not undergo notice and comment consistent with the APA.

403.    USDA did not publish the text of its Gender-Identity Mandate in the *Federal Register* as required by the APA. 5 U.S.C. §§ 552(a)(l)(D), 553.

404.    Even if the USDA School Lunch Gender-Identity Mandate or parts of it were not a substantive rule, USDA was still required to publish its text in the *Federal Register* because it is a "statement[ ] of general policy or interpretation[ ] of general applicability formulated and adopted by the agency." *Id*. § 552(a)(l)(D).

405.    The USDA School Lunch Gender-Identity Mandate published on its website unlawfully skipped the public comment period required by the APA.

406.    The USDA School Lunch Gender-Identity Mandate lacks the personal signed approval of the President or the Attorney General, and thus cannot go into effect until the President or the Attorney General approves it.

407.    Under Section 1682 of Title IX, the USDA School Lunch Gender-Identity Mandate is not effective, and cannot be effective, until approved by the President or authorized delegate. 20 U.S.C. § 1682. Under 3 U.S.C. § 301, this authority was delegated to the Attorney General but not to other HHS or DOJ officials. Exec. Order 12250 § 1-1, 45 Fed. Reg. 72,995 (Nov. 2, 1980) (also set out as a note under 42 U.S.C. § 2000d-1).

408.    No Senate-confirmed official signed or authorized each agency action, and thus their issuance and implementation violate the U.S. Constitution's Appointments Clause. U.S. Const. art. II § 2. Only a principal officer of the United States may exercise these powers, including the signing and promulgation of rules, and any inferior officer must be supervised by a principal officer in the enforcement of these rules.

## C.    Arbitrary and Capricious

409.    In drafting and promulgating the USDA School Lunch Gender-Identity Mandate, USDA failed to undergo reasoned decision-making.

410.    USDA offered no rationale in its departmental regulation describing why it was adding new protected classes to Title IX.

411.    USDA did not adequately consider important issues or consider alternative policies.

412.    USDA failed to define key terms such as "gender identity."

413.    USDA failed to adequately consider that sex is a biological reality and that biological sex differences are not sex stereotypes.

414.    USDA failed to adequately consider the impact of its rule on schools, and the harm that comes to students and employees when schools ignore or misconstrue the biological differences between the sexes.

415.    USDA failed to adequately consider female employees and students whose rights of privacy, equality, and safety are threatened by allowing males into female single-sex programs, such as athletics and P.E. classes, and single-sex spaces such as restrooms, locker rooms, and overnight accommodations.

416.    USDA failed to adequately consider the burden on employees who cannot use self-selected pronouns based on gender identity, or who cannot otherwise treat employees as the opposite sex, such as with dress codes.

417.    USDA failed to adequately consider schools' reliance interests in maintaining sex-specific athletic teams and P.E. classes, in keeping sex-specific policies and facilities, and in respecting free-speech, parental, and other rights.

418.    USDA failed to adequately quantify compliance costs.

419.    USDA failed to adequately consider alternative policies, such as (1) taking no action; (2) creating regulations to protect single-sex programs and facilities, female equality, free speech, parental rights, and privacy rights under the correct understanding of the law; (3) grandfathering existing categories of programs and practices covered by Title IX and other statutes; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

**D.    Constitutional Violations**

420.    The USDA School Lunch Mandate violates the Spending Clause.

421.    The public and States lacked the constitutionally required clear notice that Title IX would apply in this way when Congress passed Title IX and when federal funding first occurred.

422.    The USDA School Lunch Mandate improperly seeks to use a Spending Clause statute to preempt traditional state authority and laws.

423.    The USDA School Lunch Gender-Identity Mandate forces the school board to violate the free speech rights of employees and students under the First Amendment by adopting policies that restrict and compel school board, employee, and student speech.

424.    The USDA School Lunch Gender-Identity Mandate requires the school board, employees, and students to use self-selected pronouns that are different from an individual's biological sex, and to change employment policies governing speech, in violation of the First Amendment.

425.    The USDA School Lunch Gender-Identity Mandate is so vague and overbroad that it will chill protected expression.

426.    The USDA School Lunch Gender-Identity Mandate does not further a compelling or substantial governmental interest, is not narrowly tailored to achieve any governmental interest, and cannot satisfy First Amendment scrutiny.

**COUNT V**
**EEOC Gender-Identity Mandate**
**Administrative Procedure Act**
**(5 U.S.C. § 706; 28 U.S.C. § 2201; Ultra Vires and Unconstitutional)**

427.    The school board incorporates by reference paragraphs 1–303.

428.    The EEOC Gender-Identity Mandate (including the EEOC's website content and its 2024 Guidance) is unlawful and must be "set aside" because it is "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(D).

### A.    Statutory Violations

429.    The EEOC Gender-Identity Mandate is contrary to law and in excess of statutory authority.

430.    Title VII does not define "sex" as encompassing gender identity, and Congress intended "sex" to mean only the biological difference between male and female when it passed Title VII.

431.    Recognizing physiological differences between the sexes does not violate Title VII. In fact, sex-specific facilities can be necessary to prevent unlawful harassment.

432.    The EEOC Gender-Identity Mandate unlawfully seeks to elevate the category of gender identity (absent from Title VII) over sex (actually protected under Title VII).

433.    By its own terms, *Bostock* does not address gender-identity discrimination under Title VII beyond hiring and firing; it does not address private spaces, pronoun usage, or workplace speech.

434.    Congress has not delegated to the Defendants the authority to prohibit gender-identity discrimination under Title VII.

### B.    Procedural Violations

435.    EEOC lacks authority under Title VII to issue binding substantive rules, regulations, or guidance.

436.    Consequently, the EEOC Gender-Identity Mandate exceeds the agency's statutory authority.

437.    The EEOC Gender-Identity Mandate is a substantive rule but did not undergo notice and comment consistent with the APA. 42 U.S.C. § 2000e-12(a).

438.    Even if the EEOC Gender-Identity Mandate or parts of it are not a substantive rule, EEOC was still required to publish the text in the *Federal Register* because they are a "statement[ ] of general policy or interpretation[ ] of general applicability formulated and adopted by the agency." *Id.*

439.    EEOC did not publish the text of its Gender-Identity Mandate in the *Federal Register* as required by the APA. 5 U.S.C. § 552(a)(l)(D).

440.    The EEOC Gender-Identity Mandate was published on its website unlawfully because EEOC skipped the required public comment period.

### C.    Arbitrary and Capricious

441.    In drafting and promulgating the EEOC Gender-Identity Mandate, EEOC failed to undergo reasoned decision-making or to adequately consider important issues.

442.    EEOC failed to adequately consider that sex is a biological reality.

443.    EEOC failed to adequately consider that there is an evolving state of medical knowledge about gender-transition efforts, and that the EEOC Gender-Identity Mandate short-circuits this debate.

444.    EEOC improperly relied on unreliable facts and studies only from proponents of gender-transition efforts and improperly ignored or disregarded the numerous experts who explain that scientific evidence does not support the Gender-Identity Mandate but instead suggests that the risks of such procedures outweigh any potential benefits.

445.    EEOC failed to adequately consider the disproportionately negative impact of the EEOC Gender-Identity Mandate on women and girls.

446.    EEOC failed to adequately quantify and consider the compliance costs of its mandates.

447.    EEOC failed to adequately consider the harm that comes to employees when employers ignore or misconstrue the biological differences between the sexes.

448.    EEOC overlooked female employees whose rights of privacy and safety are threatened by allowing males into female single-sex spaces such as restrooms, locker rooms, and lactation rooms simply because those males identify as female.

449.    EEOC failed to consider the burden on employers and employees who cannot speak falsely and use self-selected pronouns based on gender identity, or cannot otherwise treat employees as the opposite sex, such as with dress codes.

450.    EEOC failed to consider alternative policies, such as exempting respecting employers' scientific judgment about gender transitions.

### D.    Constitutional Violations

451.    The EEOC Gender-Identity Mandate violates separation of powers, and is therefore contrary to constitutional right, power, privilege, or immunity.

452.    EEOC's organizational structure violates Article II of the Constitution, which vests all the executive power in the President.

453.    The Constitution requires that the President have the authority to remove those who assist him in carrying out his duties, especially in an agency that engages in both rulemaking and enforcement.

454.    The constitutional requirement of at-will removal applies to EEOC's commissioners.

455.    But EEOC interprets its own governing statute, which provides five-year terms for Commissioners, 42 U.S.C. § 2000e-4(a), as allowing removal only for cause.

456.    Under this approach, even if the President disagrees with the Commissioners, he may not remove them at will, but must cite malfeasance, inefficiency, or neglect of duty in any attempt to remove them.

457.    EEOC holds quintessentially executive powers including regulatory, enforcement, and litigating authority.

458.    EEOC's independent-agency structure thus violates the Constitution.

459.    Alternatively, as a matter of constitutional avoidance, this Court should declare that EEOC's organic statute, which provides only for a term-of-years appointment, allows for at-will removal before those terms expire.

460.    EEOC's unlawful structure renders its rules unlawful and requires setting aside the EEOC Mandates as void.[43]

461.    The EEOC Gender-Identity Mandate also exceeds Congress's Article I enumerated powers and transgresses on the reserved powers of the States (and Plaintiff Rapides Parish School Board as a public entity in the state) under the federal constitution's structural principles of federalism and the Tenth Amendment. U.S. Const. art. I, § 8, cl. 1; *id.* amend. X.

462.    The public and States lacked the constitutionally required clear notice that Title VII would apply in this way when Congress passed it.

463.    The EEOC Gender-Identity Mandate forces the school board to violate the free speech rights of employees under the First Amendment by adopting policies that restrict and compel school board and employee speech.

464.    The EEOC Gender-Identity Mandate requires the school board and employees to use self-selected pronouns that are different from an individual's

---

[43] Plaintiff Rapides Parish School Board preserves the argument that the Supreme Court should reverse or reconsider precedent governing *Consumers' Research v. Consumer Product Safety Commission*, 91 F.4th 342 (5th Cir. 2024), *cert denied* 2024 WL 4529808 (U.S. Oct. 21, 2024) (No. 23-1323), a decision about another agency.

biological sex, and to change employment policies governing speech, in violation of the First Amendment.

465.  The EEOC Gender-Identity Mandate is so vague and overbroad that it will chill protected expression.

466.  The EEOC Gender-Identity Mandate does not further a compelling or substantial governmental interest, is not narrowly tailored to achieve any governmental interest, and cannot satisfy First Amendment scrutiny.

## PRAYER FOR RELIEF

Plaintiff Rapides Parish School Board respectfully prays for judgment as follows and requests the following relief:

A.  Hold unlawful, set aside, vacate, and enjoin enforcement, under 5 U.S.C. §§ 701, 706, of the Head Start Gender-Identity Mandate, the Section 1557 rule, the Section 504 Rule, the School Lunch Gender-Identity Mandate, and the EEOC Gender-Identity Mandate, to the extent that they address gender identity and/or gender dysphoria;

B.  Issue all necessary and appropriate process, including a preliminary injunction and temporary order under 5 U.S.C. § 705, to preserve status or rights pending conclusion of the judicial review proceedings;

C.  Issue a declaratory judgment and permanent injunction preventing Defendants, including their employees, agents, successors, and all persons in active concert or participation with them, from implementing, enforcing, or applying the agency gender-identity mandates, including:

1.    That HHS and DOJ may not apply Head Start statutes, grants statutes, or any implementing regulations to encompass gender identity, gender dysphoria, or similar concepts.

2.    That HHS, USDA, and DOJ may not apply Title IX, Section 1557, or the SSA to address discrimination on the basis of gender identity or sex stereotypes or other theory.

3.    That HHS and DOJ may not apply Section 504 or Section 1557's disability protections or any implementing regulations to encompass gender dysphoria or similar concepts.

4.    That EEOC and DOJ may not apply Title VII of the Civil Rights Act of 1964 or any implementing regulations or guidance to require employers to treat employees as the opposite sex, including in access to facilities or in speech, such as with self-selected pronouns.

5.    That HHS, USDA, and DOJ may not require covered institutions to enroll students in P.E. classes or athletic programs based on students' gender identity instead of their sex.

6.    That HHS, USDA, EEOC, and DOJ may not require covered institutions to open single-sex locker rooms, changing rooms, showers, overnight accommodations, and restrooms to individuals of the opposite biological sex.

7.    That HHS, USDA, EEOC, and DOJ may not require covered institutions to mandate that students or staff participate in or affirm an employee or student's gender-transition efforts,

including by requiring students or staff to use an opposite-sex name or personal pronouns.

D.    Declare that the Head Start Mandate, the Section 1557 rule, the Section 504 Rule, the School Lunch Gender-Identity Mandate, and the EEOC Gender-Identity Mandate, to the extent that they address gender identity and gender dysphoria, violate the Administrative Procedure Act and the U.S. Constitution;

E.    Declare that EEOC's independent-agency structure violates the Constitution or that EEOC's organic statute, which provides only for a term-of-years appointment, is unconstitutional or it allows for at-will removal of EEOC Commissioners;

F.    Award to Plaintiff attorneys' fees, costs, and other expenses of this action under any applicable federal statute, including 28 U.S.C. § 2412;

G.    Adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that such declarations will have the force and effect of final judgment;

H.    Grant the requested injunctive relief without a condition of bond or other security;

I.    Grant any other relief this Court deems equitable, just, and proper; and

J.    Retain jurisdiction of this matter as necessary for enforcing this Court's orders.

Respectfully submitted this 17th day of January, 2025.

<u>s/ Michael T. Johnson</u>

**Michael T. Johnson**
LA Bar No. 14401
**Johnson, Siebeneicher & Ingram**
2757 Highway 28 East
Pineville, Louisiana 71360
Telephone: (318) 484-3911
Facsimile: (318) 484-3585
mikejohnson@jslawfirm.com

**Matthew S. Bowman\* (Lead Attorney)**
DC Bar No. 993261
**Natalie Deyo Thompson\***
DC Bar No. 90026665
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
mbowman@ADFlegal.org
nthompson@ADFlegal.org

**Julie Marie Blake\*\***
VA Bar No. 97891
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

*Counsel for Plaintiff Rapides Parish School Board*

*\*Motion for pro hac vice admission filed concurrently*

*\*\*Motion for pro hac vice admission forthcoming*